**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| WILLIAM MOORE, derivatively on behalf of MONOLITHIC POWER SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL R. HSING, T. BERNIE BLEGEN, HERBERT CHANG, EUGEN ELMIGER, VICTOR K. LEE, JEFF ZHOU, CARINTIA MARTINEZ, and EILEEN WYNNE, <br><br> Defendants, <br><br> and <br><br> MONOLITHIC POWER SYSTEMS, INC., <br><br> Nominal Defendant. | CIVIL ACTION NO. _____ <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff William Moore ("Plaintiff"), by and through his undersigned counsel, brings this shareholder derivative complaint for the benefit of nominal defendant Monolithic Power Systems, Inc. ("Monolithic" or the "Company"), against individual defendants Michael R. Hsing ("Hsing"), T. Bernie Blegen ("Blegen"), Herbert Chang ("Chang"), Eugen Elmiger ("Elmiger"), Victor K. Lee ("Lee"), Jeff Zhou ("Zhou"), Carintia Martinez ("Martinez"), and Eileen Wynne ("Wynne") (collectively, the "Individual Defendants") for breaches of their non-exculpable fiduciary duties, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against defendants Hsing and Blegen for contribution under

1

Sections 10(b) and 21D of the Exchange Act.  The Individual Defendants are all current or former Monolithic senior officers and/or members of the Company's Board of Directors (the "Board").

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Monolithic with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. This action seeks to remedy wrongdoing committed by Monolithic's directors and/or officers from February 2024 to the present (the "Relevant Period").

## I.      INTRODUCTION

1.      Monolithic, a publicly traded Delaware corporation headquartered in West Palm Beach, Florida, purports to be a fabless global semiconductor company that designs high-performance, power electronics solutions aimed at improving energy efficiency and sustainability.

2.      Monolithic's most important end market is its Enterprise Data segment, which supplies power solutions for data-center infrastructure and AI computing hardware. For fiscal year 2024, revenue from the Enterprise Data market comprised over one-third of Monolithic's total revenue.

3.      Monolithic's Enterprise Data segment includes the development and sales of power management integrated circuits ("PMICs"), specialized chips that manage voltage regulation, current control, and thermal protection in power modules that, among other things, are used in Nvidia Corporation's ("Nvidia") graphic processing units ("GPU") platforms.

4.      Nvidia, the leading supplier of GPUs, was the most significant user of Monolithic's Enterprise Data products. In 2024, indirect sales of power management solutions for Nvidia's GPU platforms accounted for approximately 17% of Monolithic's total revenue. Monolithic supplied

100% of the PMICs used in Nvidia's Hopper architecture, which was launched in 2022 and widely regarded to be the most powerful of its kind. Nvidia was replacing the Hopper server in 2024 with a new and more powerful server, the Blackwell, which was announced in March 2024 and ramped throughout the second half of 2024.

5.      Starting in late 2023, however, Nvidia began to experience serious failures in its Hopper server boards -- failures that were ultimately traced back to Monolithic's PMICs.

6.      During a February 7, 2024 earnings conference call with stockholders and analysts, defendant Hsing, Monolithic's founder, President, Chief Executive Officer ("CEO"), and Chairman of the Board, reassured stockholders that "all these issues are resolved." On a May 1, 2024 conference call, Monolithic's then-Executive Vice President ("EVP") and Chief Financial Officer ("CFO"), defendant Blegen, in responding to a question about Monolithic's relationship with Nvidia -- and its prospects for supplying PMICs for the new Blackwell server system -- represented that Monolithic was "at the front of the design cycle, we're consulted, we're integrated, in fact, with the development of the next generation of products" and claimed that the Company was strategically positioned to continue to be a "leader" in the market for such products.

7.      In truth, however, Nvidia's frustrations with Monolithic persisted and it had begun cultivating relationships with alternative PMIC suppliers, jeopardizing Monolithic's postion as the dominant supplier for the new Nvidia server.

8.      While the Individual Defendants concealed from stockholders that the quality issues with the PMICs had not been resolved, defendants Hsing and Blegen engaged in unusual, suspicious sales of their personally-held Monolithic stock in open market transactions -- reducing their overall holdings in the Company significantly by selling tranches of thousands of personally-held shares in a manner distinct from their previous stock selling patterns. Specifically, defendant

Hsing sold over *$44 million* of his Monolithic common stock while defendant Blegen sold almost *$22 million* in Monolithic stock.

9.      On October 30, 2024, stockholders were shocked when the Individual Defendants reported a slowdown in the Company's Enterprise Data revenue, which missed consensus estimates by nearly 13%.  Defendant Blegen attributed this decline to "customer ordering patterns", but analysts immediately linked the weakness to Nvidia sourcing PMICs from other competitors for the Blackwell servers. Defendant Hsing admitted on an October 30, 2024 conference call with analysts and stockholders that new and additional competitors had entered the market as of Monolithic's first and second 2024 quarters, *i.e.*, beginning in January 2024 and continuing throughout 2024.

10.      Following this disclosure, Monolithic's stock price fell by 17% in a single day, from $919.81 to $759.30 per share. Yet the Company's stock remained artificially inflated as the Individual Defendants continued to publicly downplay the severity of the problems with Nvidia.

11.      On November 11, 2024, Edgewater Research ("Edgewater"), an investment management firm, issued a report (the "Edgewater Report") revealing that Nvidia had cancelled half of its outstanding orders with Monolithic and was shifting most of its Blackwell production to competitors due to persistent "performance issues." The Edgewater Report stated that Nvidia engineers had "lost confidence" in Monolithic's PMICs and had issued "rush orders" to rival suppliers.

12.      This revelation caused Monolithic's share price to fall by another 15%, from $761.30 to $647.31 per share. Over the next week, the Company's stock price continued to decline, reaching $560 per share as stockholders absorbed corroborating reports from KeyBank, Needham, and Truist Securities confirming that Nvidia was sourcing PMICs from Monolithic's competitors.

13.     Analysts highlighted the increasingly favorable outlook for Infineon, Monolithic's main competitor in supplying PMICs to Nvidia. Brian Collello at Morningstar wrote on November 12, 2024, that "Infineon disclosed that AI revenue rose over 50% sequentially as it has more content within Nvidia's slate of Blackwell AI GPU servers. Management forecasts this AI business doubling in fiscal 2025 to EUR 500 million and reaching EUR 100 billion in two years, implying that this design win won't be a one-hit wonder." Similarly, Janardan Menon at Jeffries observed on November 13, 2024 that "[r]evenues and the growth outlook in AI power supply seems to have exceeded previous expectations just in the last few months. We believe this is due to the securing of a new major platform win at Nvidia for Blackwell, with strong orders coming through from this customer. We expect Infineon to continue to have a high market share in subsequent Nvidia platforms like Rubin as well, even though component supply for such high volume platforms is likely to be multi-sourced."

14.     Another major competitor, Renasas, similarly reported strength in its Nvidia-related business. During its results briefing for the fourth quarter of 2024, Renasas's management noted it expected to maintain its share of PMICs at Nvidia and to more than double PMIC sales to the company, further underscoring Monolithic's loss of its previously near-exclusive position as Nvidia's PMIC supplier.

15.     Confirming the loss of Nvidia business, on May 5, 2025, the Individual Defendants caused Monolithic to file its Quarterly Report on SEC Form 10-Q for the first quarter of fiscal year 2025, which noted that "[r]evenue from the enterprise data market decreased $16.8 million, or 11.2%, from the same period in 2024. This decrease was primarily due to lower sales of our power management solutions for AI applications . . . ."

16.     As a result of the events described herein, a federal securities fraud class action was initiated against the Company on February 4, 2025, captioned *Waterford Township General Employees Retirement System v. Monolithic Power Systems, Inc., et al.,* Case No. 2:25-cv-00220-JLR (W.D. Wash) (the "Securities Action").  The operative complaint in the Securities Action (the "Securities Complaint") was subsequently filed on November 12, 2025, asserting claims against Monolithic and defendants Hsing and Blegen on behalf of a class of investors who purchased or acquired Monolithic shares from February 8, 2024 through November 11, 2024 (the "Class Period").

17.     After the defendants to the Securities Action moved to dismiss the operative Securities Complaint, on May 6, 2026, U.S. District Judge James L. Robart ("Judge Robart") denied the motion to dismiss in substantial part, notwithstanding the materially heightened pleading standards applicable in the Securities Action per the Private Securities Litigation Act of 1995 (the "PSLRA").  Among other things, Judge Robart concluded that the defendants' public statements on February 7, 2024, May 1, 2024, and August 1, 2024 were sufficiently alleged to have been materially false and misleading and were actionable.

18.     In (largely) sustaining the Securities Complaint, Judge Robart further held that "***the timing and amounts of [defendants Hsing and Blegen's] stock transactions supports an inference of scienter***." Judge Robart opined that the insider sales by defendants Hsing and Blegen were "***suspicious***", despite the fact that those transactions were made pursuant to Rule 10b5-1 trading plans, because: (a) defendants Hsing and Blegen "***sold a substantial amount of stock***", (b) the stock sales were made "on February 8, 2024; March 1, 2024; May 1, 2024, and on November 8, 2024; ***prior to the release of the Edgewater Research Report***", (c) it was uncontested that ***most of the stock sales "were not made in connection with a tax obligation***"; and (d) it was uncontested

that "*the volume of trades during the Proposed Class Period greatly exceeded the volume of trades in the two years preceding the Proposed Class Period, when [defendants Hsing and Blegen] 'rarely, if ever, sold shares except to cover tax liabilities attendant to their acquisition of more stock*.'"

19.     In light of the Individual Defendants' serious misconduct -- which has subjected the Company to, among other things, the largely-sustained Securities Action, the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein -- the Company will have to expend many millions of dollars.

20.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of defendants Hsing's and Blegen's liability in the sustained Securities Action, and of their not being disinterested and/or independent directors, a majority of the current members of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## II.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-

5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Action based on violations of the Exchange Act.

23. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining its corporate headquarters and operations in this District, or he or she is an individual who is a citizen of Florida or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

26. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as the Company has its principal executive offices located in this District and conducts substantial business here, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

III. PARTIES

27. Plaintiff is a current owner of Monolithic common stock and has owned Monolithic common stock continuously since January 2024.

28. Nominal defendant Monolithic is a Delaware corporation which maintains its corporate headquarters in West Palm Beach, Florida. According to its public filings, Monolithic is a provider of power management components used in electronic systems. Monolithic's common stock is listed on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "MPWR."

29.     Defendant Hsing founded the Company in 1997 and has served as its President and CEO, and as Chairman of the Board, since that time.  As described herein, defendant Hsing is a named individual defendant in the Securities Action and has had federal securities fraud claims sustained against him in that case, notwithstanding the materially heightened PSLRA pleading standards. Moreover, in the Company's Annual Proxy Statements, including its most recent Annual Proxy Statement filed with the SEC and disseminated to stockholders on April 30, 2026, the Board has acknowledged that defendant Hsing is not an independent director.

30.     Defendant Blegen served as the Company's EVP and CFO from 2016 until his retirement, effective February 27, 2026.  Defendant Blegen is a named individual defendant in the Securities Action and has had federal securities fraud claims sustained against him in that case, notwithstanding the materially heightened PSLRA pleading standards.

31.     Defendant Chang has served as a member of the Board since 1999.  Defendant Chang also has served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period. Moreover, during the "Class Period" as defined in the Securities Action (to which defendant Chang is not a party), defendant Chang sold 1,100 shares of his personally-held Company stock for nearly $840,000 in proceeds.

32.     Defendant Elmiger has served as a member of the Board since 2012.

33.     Defendant Lee has served as a member of the Board since 2006.  In addition, during the Relevant Period, defendant Lee has served as Chairman of the Audit Committee.  Moreover, during the "Class Period" as defined in the Securities Action (to which defendant Lee is not a party), defendant Lee sold 1,000 shares of his personally-held Company stock for over $820,000 in proceeds.

34.     Defendant Zhou has served as a member of the Board since 2010. In addition, during the Relevant Period, defendant Zhou has served as a member of the Audit Committee. Moreover, during the "Class Period" as defined in the Securities Action (to which defendant Zhou is not a party), defendant Zhou sold 400 shares of his personally-held Company stock for over $300,000 in proceeds.

35.     Defendant Martinez has served as a member of the Board since 2021.

36.     Defendant Wynne has served as a member of the Board since 2023.  In addition, during the Relevant Period, defendant Wynne has served as a member of the Audit Committee.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

37.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit. Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

39. At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

40. To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

   a. manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

   b. neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

   c. establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

   d. neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

   e. ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

   f. conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.  ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.  remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

41.  Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

42.  The Company's Code of Ethics and Business Conduct (the "Code") expressly applies to all directors and officers of Monolithic.  The Code, in pertinent part, states that the Code is designed to deter wrongdoing and promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

12

- Full, fair, accurate, timely and understandable disclosure in reports and documents we file with or submit to the U.S. Securities and Exchange Commission and in our other public communications; • Compliance with applicable laws, rules and regulations;

- The prompt internal reporting of violations of this Code; and

- Accountability for adherence to this Code.

43. The Code further provides, among other things, the following:

- directors and officers "should seek in good faith to adhere to and comply with the laws, rules, regulations and regulatory orders applicable to the conduct of our business"

- directors' and officers' "decisions and actions…should be based on the best interest of the company, and not based on personal relationships or benefits"

- You may not intentionally misrepresent the company's financial performance or otherwise intentionally compromise the integrity of the company's reports, records, policies and procedures.

- You may not directly or indirectly—through, for example, significant others, family members or controlled entities—buy or sell stocks or other securities of the company or any other company based on nonpublic information obtained from your work at the company.

44. The Company also maintains an Audit Committee Charter which provides that the Audit Committee's purposes include providing oversight over the Company's financial reporting process, assisting the full Board in the oversight of the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls.  The specific duties of the Audit Committee members, per the Audit Committee Charter, include:

- Reviewing the reports of management and the independent auditors concerning the design, implementation and maintenance of the Company's system of internal controls and procedures for financial reporting, including meeting periodically with the Company's management and the independent auditors to review their assessment of the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's

periodic filings and, when applicable, required attestations or reports by the independent auditors relating to such disclosure;

- Reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release, and reviewing and discussing the annual audited financial statements and quarterly unaudited financial statements with management, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

- Reviewing before release any other material financial information of the Company in press releases or other SEC filings, including Current Reports on Form 8-K or proxy statements;

- Recommending to the Board of Directors, if deemed appropriate, that the audited financial statements be included in the Company's Annual Report on Form 10-K, in accordance with the rules and regulations of the SEC;

- Reviewing with the Company's independent auditors, before filing with the SEC, the results of the independent auditor's review of the Company's interim financial statements included in Quarterly Reports on Form 10-Q;

- Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors and management's response to such suggestions.

- Reviewing approving and monitoring the Company's code of ethics for its principal executive and senior financial officers.

## V.   FACTUAL BACKGROUND

### A.   The Company and Its Operations

45.   Monolithic was founded in 1997 by its current President, CEO, and Board Chairman, defendant Hsing. Its corporate headquarters are located in West Palm Beach, Florida and the Company has over 4,000 employees worldwide with various locations in Asia, Europe, and the U.S.

46.   Monolithic provides high-performance, semiconductor-based power electronics solutions. The Company designs and manufactures integrated circuits that control, convert, and

manage electrical power within electronic systems. These chips are essential for ensuring that devices, from data center servers to consumer electronics, operate efficiently, safely, and with minimal energy loss.

47.	Monolithic is a "fabless" company: it does not own or operate its own manufacturing facilities ("fabs"). Instead, Monolithic outsources the production of its chips to specialized third-party manufacturers known as "foundries." To sell its products, the Company claims that it relies on a staff of technical sales and applications engineers who assist prospective customers with the design and use of the Company's products and in the development of the customers' own products. According to Monolithic, this process enables the Company to meet customers' exacting specifications for quality and performance and promotes future product sales.

48.	Monolithic reports its financial and operational results under a single operating segment. However, the Company also reports revenue generated by sales into various end markets. Chief among these end markets is Enterprise Data, which includes sales of power management modules to technology companies engaged in supplying GPUs that are used to run and operate artificial intelligence ("AI") data servers. Nvidia -- the world's leading supplier of GPUs -- is Monolithic's largest customer.

49.	Due to intense demand for AI applications, global technology companies have poured hundreds of billions of dollars into the construction of data centers necessary for the development of AI technologies. Amid this influx of AI-related capital, Nvidia launched the "Hopper" GPU in late 2022, which was used to construct the next wave of AI data centers.

50.	As the sole supplier of certain power modules used in Nvidia's Hopper GPUs, Monolithic benefitted from the downstream effects of the growing demand for AI infrastructure. For example, following the launch of Nvidia's Hopper GPUs, Monolithic's Enterprise Data

business quickly became the Company's largest and fastest growing unit, jumping from 11% of total sales in the second fiscal quarter of 2023 to roughly 27% of sales the following quarter. By the end of the fourth quarter of 2023, Enterprise Data had become Monolithic's largest business segment, representing approximately 28% of the Company's overall sales.

51.     During the Relevant Period, the Individual Defendants repeatedly represented to stockholders that the widespread adoption and use of the Company's products within the AI industry was due to the purportedly superior performance of Monolithic products. For example, during a February 2024 conference call with analysts and stockholders, defendant Hsing represented that Monolithic's customers were "very receptive" to the Company's products and claimed that client demand was increasing because Monolithic was able to "solve" issues within their systems. During a subsequent conference call with stockholders, defendant Blegen similarly stated that Monolithic's products had gained a majority market share due to the Company's innovative solutions and claimed that Monolithic could maintain its market-leading position because the Company was working with clients, including Nvidia, on the development of their next-generation products.

52.     In Monolithic's filings with the SEC, the Individual Defendants also repeatedly emphasized the Company's purported specialization in semiconductor technologies and highlighted the supposed reliability and performance of Monolithic's products. For example, in Monolithic's Quarterly Reports on SEC Form 10-Q, the Individual Defendants represented that the Company possessed "innovative proprietary" technology and an "expertise" in semiconductor design and claimed that these advantages allowed the Company to deliver "reliable, compact, and monolithic solutions."

53.     As a result of the demand for Monolithic's purportedly superior products, the

16

Individual Defendants reported favorable revenue growth during the Relevant Period. For example, for the second fiscal quarter of 2024, the Individual Defendants reported "record" quarterly revenue of $507 million. The Individual Defendants attributed this unprecedented revenue growth in substantial part to increased customer demand for Monolithic's AI power solutions, which had caused Enterprise Data revenue to increase 290% year-over-year to $187 million, from $48 million in the prior year quarter.

54.     In the wake of these disclosures, analysts applauded Monolithic's financial results. For example, a Deutsche Bank analyst report stated that Monolithic was a "[b]eacon on a hill" compared to its peers which, in contrast, had reported "relatively muted" financial results. Similarly, an Oppenheimer analyst report stated that Monolithic had reported "standout" results, making the Company a "Rose Among Thorns" given recent "peer malaise."

55.     Unbeknownst to stockholders, however, Monolithic's power management solutions were suffering from significant performance and quality control issues, which, in turn, negatively impacted the GPUs they powered like those supplied by Nvidia. Contrary to the Individual Defendants' public representations that Monolithic had resolved quality issues with the components the Company supplied to Nvidia, these issues were in fact ongoing. As a result of these shortcomings, Monolithic's relationship with Nvidia (its largest customer) had been damaged, thereby exposing Monolithic to material undisclosed risks of significant business, financial, and reputational harm and causing Monolithic to lose significant market share in supplying PMICs to Nvidia's new, cutting edge Blackwell server.

56.     Monolithic differentiates itself from competitors with its "monolithic" design philosophy, which involves integrating an entire power system onto a single silicon chip. Silicon, a semiconductor whose electrical conductivity can be adjusted to fall between that of a conductor

(like copper) and an insulator (like rubber), enables this integration. The Company's "monolithic" approach allows it to produce smaller, more efficient, single-chip power management integrated circuits (ICs).

57.    ICs are circuits in which a number of transistors and other elements are electrically interconnected to form a more complicated electronic circuit.

58.    Monolithic focuses on the market for high performance analog and mixed-signal ICs:

   a.    **Analog ICs** respond to real world signals such as temperature, pressure, light, sound, or speed and perform power management functions, such as regulating or converting voltages, for electronic devices.

   b.    **Mixed-signal ICs** combine digital and analog functions onto a single chip and play an important role in bridging real world applications to digital systems.

59.    Monolithic's key product families include Direct Current ("DC") to DC, Alternating Current ("AC") to DC, driver metal-oxide-semiconductor field-effect transistor, power management IC, current limit switch and lighting control products.

60.    A **power management integrated circuit** (PMIC) is a specialized chip that controls how electrical power is delivered and regulated within an electronic device. It handles key functions such as voltage regulation, current control, power sequencing (turning different parts of the device on and off), efficiency optimization, and protection against overheating, overvoltage, and short circuits.

61.    PMICs are generally considered analog integrated circuits because these core functions involve continuous real-world electrical signals, however, Monolithic's PMICs

incorporate digital logic that enables programmability and advanced system control and are therefore classified as mixed-signal ICs.

62.     Monolithic's key end markets, in descending order of revenue contribution, are enterprise data (32.5%); storage and computing (22.7%); automotive (18.8%); communications (10.2%); consumer applications (9.1%); and industrial (6.7%).

63.     The Enterprise Data end market encompasses, most importantly, data-center and cloud infrastructure markets, in particular, power solutions for servers, storage, networking, and AI computing hardware. Selling PMICs for Nvidia's GPU chips (used in data center infrastructure) was the singular most important part of the Company's Enterprise Data market.

**B.     Nvidia Was the Most Important User of Monolithic's PMICs**

64.     Nvidia is a leading designer of GPUs, which are specialized electronic circuits built for parallel processing—performing many mathematical operations simultaneously. Nvidia's GPUs are central to AI acceleration, deep learning, and high-performance computing.

65.     Nvidia's Hopper architecture, launched in 2022, was specifically engineered for large-scale computing applications and excelled in transformer-based AI models, large language models (LLMs), and scientific workloads. The H100 is the Hopper architecture GPU, which was widely deployed in AI servers through 2024.

66.     Within each GPU, PMICs are essential components that enable high power delivery for demanding AI tasks while maintaining thermal efficiency and stable performance. GPUs like Nvidia's H100 require numerous power "rails"—distinct voltage levels and current requirements—each controlled by a dedicated PMIC. These rails power different subsystems on the GPU, including processing cores, memory, high-speed I/O, and auxiliary circuits.

67.     PMICs are also essential components within the larger HGX baseboards that house multiple GPUs. HGX boards are Nvidia's reference server platforms, each of which contain

multiple GPUs and are used by hyperscalers such as Google and Microsoft as the foundation for AI servers.

68.     Nvidia was Monolithic's most important indirect customer. Truist analyst William Stein noted in a December 16, 2024 report that by the end of 2024, Nvidia's purchases represented approximately 50% of Monolithic's Enterprise Data end market and 20% of its total sales. Chris Caso at Wolfe Research wrote on January 16, 2025 that Monolithic supplied 100% of the PMIC chips used in Nvidia's Hopper GPUs.

69.     Monolithic does not typically sell directly to Nvidia. Instead, the Company relies on third-party distributors and value-added resellers, or sells directly to contract manufacturers or board assemblers in Asia that integrate Monolithic's PMICs into Nvidia GPUs and HGX boards.

70.     Nvidia's Blackwell architecture, released in 2024 and expected to be widely available by the end of 2025, is the successor to the Hopper GPU platform. Blackwell is designed for the most demanding computational workloads, including training large AI models, running complex simulations, and accelerating generative AI applications.

71.     Blackwell delivers a 2.5× performance increase over Hopper while being 25× more energy efficient and six times faster than Hopper for large datasets. As Nvidia's CEO, Jensen Huang, remarked in January 2025, "I said before that when Blackwell starts shipping in volume, you couldn't give Hoppers away . . . There are circumstances where Hopper is fine, that's the best thing I could say about Hopper . . . ."

72.     As it became clear that the Blackwell architecture would soon render the Hopper obsolete, stockholders began to pay close attention to whether Monolithic's PMICs would play as important a role in Blackwell as they did in the Hopper.

## VI.    THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS TO STOCKHOLDERS

73.    On February 8, 2024, the Individual Defendants caused Monolithic to issue a press release announcing the Company's financial results for its fourth fiscal quarter and year ending December 31, 2023 ("4Q23 Release"). The 4Q23 Release stated that Monolithic's quarterly revenues decreased to $454 million from $460 million in the prior year quarter. The 4Q23 Release added that quarterly revenues within the Company's Enterprise Data business increased to $129 million from $68 million in the prior year quarter.

74.    Also on February 8, 2024, certain of the Individual Defendants participated in the Company's conference call with analysts and stockholders to discuss the Company's financial and operational results for the fourth quarter of 2024, which was hosted by defendants Hsing and Blegen ("4Q23 Earnings Call").

75.    During the 4Q23 Earnings Call, Nathaniel Quinn Bolton ("Mr. Bolton") of Needham & Company asked about "new ramps with probably higher content," referring to the start of production of Nvidia's Blackwell and other next-generation systems with substantial power demands. Higher power consumption typically increases the number and complexity of power management components per unit. Mr. Bolton wanted to know how the potential "increase in competition" might impact "average dollar content per win" (revenue Monolithic earns per system design that incorporates its chips), which would otherwise "trend[] higher as power consumption goes up."

76.    In response, defendant Hsing reassured Mr. Bolton "at this time, we want to solve all the problems and *we believe we resolve all these issues during this fast ramp*. And also the cost at this time is not really the issue. *It's all about the throughput and to meet the customer demand*."

77. The italicized statements identified in ¶76 were materially false and misleading and omitted material facts. First, it was false and misleading for defendant Hsing to claim that "all these issues during this fast ramp" were resolved.[1] At the time that statement was made, Nvidia's Hopper server boards had been experiencing failures during production testing, a problem that was traced back to Monolithic's PMICs and the issues had not been resolved. Second, defendant Hsing misled stockholders by claiming "it's all about the throughput and to meet the customer demand." Defendant Hsing omitted from his statements and failed to reveal that the quality control issues Monolithic experienced negatively impacted its relationship as a supplier for Nvidia's servers which negatively impacted Monolithic's ability "to meet the customer demand." Thus, defendant Hsing misleadingly sought to reassure Mr. Bolton and stockholders that Monolithic had resolved its quality control problems and they would not affect Nvidia's allocation of its orders for power solutions for its next-generation Blackwell. In fact, on November 11, 2024, Edgewater reported that this slowdown was caused, at least in part, by Nvidia cancelling half of its outstanding Monolithic orders because of "[p]erformance issues" with the Company's products. The Edgewater Report also disclosed that Nvidia engineers "lost confidence" in Monolithic's products and decided to turn to the Company's competitors as Nvidia's "primary suppliers."

78. Later during the 4Q23 Earnings Call, Richard Ewing Schafer of Oppenheimer & Co. asked: "I was just curious to get your thoughts on if it gets harder or the competition going forward as guys like NVIDIA move from a 2-year cadence on new processor development to an annual cadence."

---

[1] By "fast ramp," defendant Hsing was referring to the rapid scale up in production of PMICs for Nvidia's Hopper as AI GPU demand surged.

79.     Defendant Hsing responded that "[s]o far, in what we have, okay, and our customers can be very receptive to our solution. So far, we pretty much have a majority of the volumes. *And they keep requesting it and keep requesting we solve all these issues,* related to their system issues, ours and issues from our side . . . So we start to win a lot of -- a lot of shares. And the same is in the servers and have a very similar trend. And that's how we win the market. And we always want to do -- as we said in the past, we want to push in the technology. We want to make sure we're the best."

80.     The italicized statement identified in ¶79 was materially false and misleading and omitted material facts. At the time defendant Hsing responded to an analyst's question about Monolithic's competition for supplying Nvidia's GPU architectures with PMICs by saying "they keep requesting it and keep requesting we solve all these issues," Monolithic's relationship with Nvidia had already begun to deteriorate because of significant performance and quality control issues with its PMICs. In late 2023, Nvidia's Hopper server boards began to experience failures during production testing, a problem that was traced back to Monolithic's power modules. At that point, Nvidia began searching for additional PMIC suppliers. This development led to the slowdown in Monolithic's Enterprise Data segment in 3Q24, because Nvidia was moving away from using Monolithic's PMICs. As discussed, on November 11, 2024, Edgewater reported that this slowdown was caused, at least in part, by Nvidia cancelling half of its outstanding Monolithic orders because of "[p]erformance issues" with the Company's products. The Edgewater Report also reported that Nvidia engineers "lost confidence" in Monolithic's products and decided to turn to the Company's competitors as Nvidia's "primary suppliers."

81.     Later during the 4Q23 Earnings Call, defendant Hsing acknowledged that Monolithic had experienced "some issues" with its power management components, but again

reassured stockholders that "***all these issues are resolved***," which he claimed would enable Monolithic to "significantly" increase the amount of products installed on customer projects, stating:

> Yes, okay. We had some issues on the Stage 1. We had some design wins and very small volumes in different systems, actually. Now we don't have – ***all these issues are resolved***. That will significantly gain the content. And in each AR systems.

82.     The italicized statement identified in ¶81 was materially false and misleading and omitted material facts. At the time defendant Hsing reassured stockholders that "all these issues are resolved," the quality control issues had not been resolved as evidenced by the fact that Monolithic's Enterprise Data revenue declined significantly in its 2024 third quarter because it received fewer orders for its PMICs for Nvidia's servers as Nvidia began to replace Monolithic with other suppliers. As noted, on November 11, 2024, Edgewater reported that this slowdown was caused, at least in part, by Nvidia cancelling half of its outstanding Monolithic orders because of "[p]erformance issues" with the Company's products. The Edgewater Report also reported that Nvidia engineers had "lost confidence" in Monolithic's products and decided to turn to the Company's competitors as Nvidia's "primary suppliers."

83.     Analysts took note of defendant Hsing's reassurances on the 4Q24 Earnings Call. On February 7, 2024, William Stein of Truist Securities noted in a report that "[o]ver the last few days one of our industry contacts (component buyers/sellers) highlighted a 'quality issue' with MPWR [Monolithic] in NVDA's (Buy) products. Today, MPWR confirmed it did face a quality concern with NVDA. The good news is that MPWR identified the problem, the failure rate is low, the problem is fixed, and the relationship remains on solid footing."

84.     On February 29, 2024, the Individual Defendants caused the Company to file its Annual Report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K"), which

was signed by all of the Individual Defendants, and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Hsing and Blegen attesting to its accuracy. The 2023 10-K contained the same financial information for the Company's quarterly and annual revenues as set forth in the 4Q23 Release.

85.     In the 2023 10-K, the Individual Defendants also represented that the Company had "core strengths" with respect to design expertise and proprietary technologies, which they claimed would enable Monolithic to offer "reliable" and "cost-effective" products. Moreover, the Individual Defendants represented that the Company "differentiate[d]" itself "by offering solutions that are . . . more accurate with respect to performance specifications and, consequently, more cost-effective than many competing solutions." Similarly, in the 2023 10-K, the Individual Defendants stated that the Company's power management solutions were "differentiated" in the market as a result of, among other things, Monolithic's "increased reliability" and "lower" system cost as compared to products from competitors.

86.     The Individual Defendants' statements in the 2023 10-K were materially false and misleading and failed to disclose, among other things, that: (1) the Company's voltage regulator modules and power management integrated circuits had been plagued by serious quality control and performance problems; (2) these defects detrimentally affected the performance of certain Nvidia products in which such Company products were used; (3) the Company knew about, but failed to adequately address and resolve, the issues plaguing the performance of the power management solutions Monolithic provided to Nvidia; (4) as a result of the foregoing, Monolithic's relationship with Nvidia, its most important customer, had been irreparably harmed.

87.     On April 29, 2024, the Individual Defendants caused the Company to file its 2024 annual proxy statement with the SEC (the "2024 Proxy Statement") and disseminate the 2024

Proxy Statement to stockholders. The 2024 Proxy Statement was solicited by defendants Hsing, Chang, Elmiger, Lee, Martinez, Wynne, and Zhou pursuant to Section 14(a) of the Exchange Act and contained various materially false and misleading statements and omissions.

88.     The 2024 Proxy Statement called for stockholders to, among other things: (1) re-elect defendants Elmiger, Wynne, and Zhou to the Board; (2) ratify the appointment of Ernst & Young LLP ("E&Y") as the Company's independent registered public accounting firm for 2024; and (3) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers.

89.     With respect to the Company's Code, the 2024 Proxy Statement stated the following:

> We have adopted a Code of Ethics and Business Conduct, which is applicable to our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer, controller or persons performing similar functions. The Code of Ethics and Business Conduct is available in the "*Investor Relations*" section of our website at http://www.monolithicpower.com. We will disclose on our website any amendment to the Code of Ethics and Business Conduct, as well as any waivers of the Code of Ethics and Business Conduct, that are required to be disclosed by the rules of the SEC or NASDAQ.

90.     With respect to "Board Oversight of Risks," the 2024 Proxy Statement stated the following, in relevant part:

> The Board is primarily responsible for the oversight of risks that could affect MPS. The Board believes that a fundamental part of risk management is understanding the risks that we face, monitoring these risks, and adopting appropriate controls and mitigation activities for such risks. We believe that the risk management areas that are critical to our long-term success primarily include product development, supply chain and quality, regulations and legal compliance, ESG, executive compensation programs, sales and promotions, and business development, as well as protection of our assets (financial, intellectual property and cybersecurity), all of which are managed by senior executive management reporting directly to our Chief Executive Officer. Our Board members have extensive experience in risk oversight arising from their current or prior experience as chief executive officers, chief financial officers, chief information officers, as well as other senior leadership positions or board members of other companies with responsibility for risk oversight

obligations. As such, the Board believes that its members are qualified and experienced at identifying and addressing risk throughout our operations.

While the full Board has retained responsibility for general oversight of risk, the Board's oversight is conducted principally through the committees of the Board. The Board satisfies its responsibility by requiring each committee chair to regularly report the committee's considerations and actions, including risk oversight, as well as by requiring officers responsible for oversight of particular risks to submit regular reports. As these reports are submitted independent of review by Mr. Hsing, the Board believes that its leadership structure has no impact on the conduct of its risk oversight function other than to reinforce the involvement of the Board in ongoing management of MPS.

91.	Under the direction and watch of defendants Hsing, Chang, Elmiger, Lee, Martinez, Wynne, and Zhou, the 2024 Proxy Statement was materially false and misleading and failed to disclose, among other things, that: (1) the Company's voltage regulator modules and power management integrated circuits had been plagued by serious quality control and performance problems; (2) these defects detrimentally affected the performance of certain Nvidia products in which such Company products were used; (3) the Company knew about, but failed to adequately address and resolve, the issues plaguing the performance of the power management solutions Monolithic provided to Nvidia; (4) as a result of the foregoing, Monolithic's relationship with Nvidia, its most important customer, had been irreparably harmed. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

92.	Moreover, the 2024 Proxy Statement was materially false and misleading because, despite the Individual Defendants' assertions to the contrary, the Board was not adequately performing its risk oversight functions, and the Company's Code was not being followed.

93.	As a result of defendants Hsing, Chang, Elmiger, Lee, Martinez, Wynne, and Zhou causing the 2024 Proxy Statement to be false and misleading, the Company's stockholders voted, among other things, to: (1) re-elect defendants Elmiger, Wynne, and Zhou to the Board, thereby

allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of E&Y as the Company's independent registered public accounting firm for 2024; and (3) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers.

94.     On May 1, 2024, the Individual Defendants caused Monolithic to issue a press release announcing the Company's financial results for its first fiscal quarter ending March 31, 2024 ("1Q24 Release"). The 1Q24 Release stated that Monolithic's quarterly revenues increased to $458 million from $451 million in the prior year quarter. The 1Q24 Release further stated that quarterly revenues within the Company's Enterprise Data business increased to $150 million from $47 million in the prior year quarter.

95.     That same day, the Individual Defendants caused Monolithic to conduct a conference call with analysts and stockholders to discuss the Company's financial and operational results for the first quarter of 2024, which was hosted by defendants Hsing and Blegen. In response to a question from an analyst regarding the Company's relationship with its "largest enterprise data customer" (*i.e.*, Nvidia), defendant Blegen represented that Monolithic was "***at the front of the design cycle, we're consulted, we're integrated, in fact, with the development of the next generation of products***" and claimed the Company was strategically positioned to continue to be a "***leader***" in the market for such products.

96.     Defendant Blegen's response to the analyst's question in ¶95 was materially false and misleading when made. Nvidia was frustrated with Monolithic's quality control issues and its relationship with Nvidia was damaged as a result. Monolithic lost its position as a leading supplier of PMICs for the Blackwell server as evidenced by the substantial decline in Enterprise Data revenue for Monolithic's 2024 fiscal third quarter, defendant Hsing's statement, on October 30,

28

2024, that additional competitors were supplying Nvidia which, he admitted "happened in the last couple of quarters" *i.e.*, Monolithic's 2024 first and second quarters, and competitors' (Infineon and Renasas) increased sales attributed to Nvidia's Blackwell server.

97. On August 1, 2024, the Individual Defendants caused Monolithic to issue a press release announcing the Company's financial results for its second fiscal quarter ending June 30, 2024 ("2Q24 Release"). The 2Q24 Release stated that Monolithic's quarterly revenues increased to $507 million from $441 million in the prior year quarter. The 2Q24 Release further stated that quarterly revenues within the Company's Enterprise Data business increased to $187 million from $48 million in the prior year quarter.

98. That same day, the Individual Defendants caused Monolithic to hold a conference call with analysts and stockholders to discuss the Company's financial and operational results for the second quarter of 2024, which was hosted by defendants Hsing and Blegen. During his prepared remarks, defendant Blegen emphasized Monolithic's "record" revenue growth, which he attributed in substantial part to increased demand for the Company's AI power solutions, stating in pertinent part as follows:

> Let me open by saying MPS reported yet another record quarter, with Q2 2024 revenue of $507.4 million, exceeding the high end of our guidance. ***Our strong revenue growth was attributed to three factors: increased demand for AI power solutions, improving order trends in several of our end markets, and lastly, initial revenue ramps associated with design wins secured in past years***.

99. The italicized portion of defendant Blegen's statements in ¶98 were materially false and misleading when made and omitted to reveal material facts. While defendant Blegen attributed strong revenue growth, in part, to "improving order trends" and "design wins" this was misleading as it omitted to reveal that Monolithic's quality control issues damaged its relationship with Nvidia causing it to seek out new and additional suppliers for PMICs for its new Blackwell server. In fact,

defendant Hsing subsequently acknowledged on October 30, 2024 that additional competitors were supplying Nvidia which he admitted "happened in the last couple of quarters" *i.e.*, Monolithic's 2024 first and second quarters.

100.     In an analyst report published nearly two months later, on October 24, 2024, Seymore noted that "[h]eading into 3Q24 earnings . . . we expect investor attention to focus upon . . . How will MPWR's Enterprise Data segment perform in the near/medium term given the product transition at its largest customer (NVDA) and debate of increased competition in Blackwell?"

## VII.    THE TRUTH EMERGES

101.     On October 30, 2024, the Individual Defendants caused Monolithic to issue a press release announcing the Company's financial results for its third fiscal quarter ending September 30, 2024 ("3Q24 Release"). The 3Q24 Release revealed an unexpected slowdown in Monolithic's critical Enterprise Data segment, with quarterly revenue declining sequentially to $184 million, down from $187 million in the prior quarter and missing consensus estimates of $211 million by nearly 13%.

102.     During Monolithic's third quarter earnings conference call on October 30, 2024, defendant Hsing represented that Monolithic's provision of "best"-in-class power solutions had allowed the Company to maintain a dominant initial share of the burgeoning AI market, stating in pertinent part as follows:

> Yes. I mean you probably – everybody knows that if you look at the transcript from the last year, we talked about the market is big and that the market is growing or the AI requirements is growing. And so the customers initially will take the – ***always take the best solutions to fulfill their needs*** and the best solution and also the speed of the development service, as Bernie said earlier. ***And that's why we occupied a pretty large shares***, okay? And last year, we said, okay, this market is too big and MPS will be always have the best solutions in these applications. And we also talk about the market is bigger. There will be a second or third or fourth supplier to join this segment. ***And this – and when will that happen, and we don't***

> *know, okay? It happened in the last couple of quarters*. And again, in next years, what we see – again, the market is growing very fast. [Emphasis added.]

103. During the call, an analyst asked about Monolithic's "opportunity" within AI accelerators in the upcoming year. In response, defendant Hsing stated that Monolithic's power solutions were the "*best*" and "*most power efficient*" in the industry, and represented to stockholders that the Company's Enterprise Data business "*will grow*."

104. In the wake of these disclosures, analysts reported that Monolithic's lackluster sales within its Enterprise Data segment were due to a decrease in Nvidia orders.

105. Hans Mosesmann of Rosenblatt stated "Enterprise Data (AI Nvidia-driven) took a pause for 4Q24, we think, on the delayed Blackwell ramp. The issue for investors to fix on is the rather precarious position of having most of the Nvidia Hopper and early Blackwell power module vertical/lateral share and then sharing the socket with two other players, likely Renesas and Infineon, in 2025."

106. Joshua Buchalter of TD Cowen wrote "[w]e believe inventory build is likely to blame but admittedly are left scratching our heads as the AI- and server-levered Enterprise Data segment printed down -1% Q/Q, well below our expectations for +10% Q/Q and the Street's +13%. MPS had signaled a moderation to sequential growth during our meetings intra-quarter (here), but the magnitude was much greater than investors (and our own model) had contemplated."

107. On this news, the price of Monolithic common stock fell more than $160 per share from $919.81 per share on October 30, 2024 to $759.30 per share on October 31, 2024, a decline of more than 17%. But the price of Monolithic common stock remained artificially inflated as the Individual Defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

108.    On November 11, 2024, Edgewater analysts issued an explosive report revealing that Nvidia had cancelled half of its outstanding Monolithic orders and intended to eliminate Monolithic's allocation to most variants of its next-generation Blackwell chips due to "[p]erformance issues" with the Monolithic's products. The Edgewater Report also revealed that Nvidia engineers "lost confidence" in Monolithic's products and decided to turn to the Company's competitors as Nvidia's "primary suppliers." Corroborating these claims, the Edgewater Report noted that Monolithic's competitors had received "rush orders" in recent weeks for components related to Nvidia's most-advanced Blackwell models.

109.    On this news, the price of Monolithic common stock fell $114 per share from $761.30 per share on November 8, 2024 to $647.31 per share on November 11, 2024, a decline of 15%.

110.    While the Individual Defendants attempted to refute the disclosures contained in the Edgewater Report, the market found the claims credible and concerning. As a result, in subsequent trading days the price of Monolithic stock continued to fall, reaching a low of $560 per share on November 20, 2024.

111.    Furthermore, later reporting confirmed that Monolithic's declining Enterprise Data revenue was connected with PMIC performance issues in Nvidia's products. On November 17, 2024, John Vinh of KeyBanc wrote "[w]e believe MPWR will lose significant market share on Blackwell with the ramp of GB200/B200, as Hopper PMIC overheating issues have persisted on Blackwell . . . we believe NVDA has been experiencing overheating issues with MPWR's PMIC in its testing and, as a result, will not have any share on GB200/B200. These overheating issues appear to be related to the PMIC issues we had flagged on Hopper and likely worsened as the power requirements increased on Hopper at 700W to 1,000W on Blackwell . . . given that these

32

issues had persisted on Hopper at 700W and were never completely resolved, we believe significant uncertainty exists as to when MPWR will be able to reenter NVDA's supply chain."

112.    Mr. Bolton of Needham & Co. wrote on November 21, 2024 that "[r]ecent reports from a competing broker and the Asia supply chain have raised questions about the performance of MPWR's multi-phase solutions at higher power levels. The company has refuted these claims and believes there are no technical issues with its solutions. However, regardless of the reason, we believe NVIDIA recently made a decision to ramp initial Blackwell volumes using competing multi-phase solutions from Infineon and Renesas . . . We are also reducing our assumption for MPWR's share of NVIDIA's Hopper platform to 50% over the next couple quarters as we believe NVIDIA is ramping Renesas as a second source. Additionally, based on commentary from NVIDIA on its F3Q25 earnings call, we expect a rapid cutover to Blackwell volumes through 2025 driven strong demand for this higher-TCO platform. As a result, we see Hopper volumes declining meaningfully beyond 1Q25."

113.    On December 16, 2024, William Stein of Truist Securities lowered his price target for Monolithic, noting that "[w]e believe that MPWR's challenges with NVDA stem from a quality concern or debate arising from MPWR's supporting a meteoric rise in NVDA's demand during 2023 . . . [W]e have no confidence in MPWR's share in Blackwell. We suspect the answer lies more in the ability of new suppliers – likely Renesas and Infineon – to ramp production with good yields and high quality. As a result of our recognition that there is a clear imperfection in MPWR's relationship with NVDA, we are adjusting our model . . . ."

114.    Analysts also noted the increasingly favorable outlook for Monolithic's main competitor in supplying PMICs to Nvidia, Infineon. Brian Collello at Morningstar, wrote on November 12, 2024, that "Infineon disclosed that AI revenue rose over 50% sequentially as it has

more content within Nvidia's slate of Blackwell AI GPU servers. Management forecasts this AI business doubling in fiscal 2025 to EUR 500 million and reaching EUR 100 billion in two years, implying that this design win won't be a one-hit wonder." Similarly, Janardan Menon at Jeffries, wrote on November 13, 2024, "Revenues and the growth outlook in AI power supply seems to have exceeded previous expectations just in the last few months. We believe this is due to the securing of a new major platform win at Nvidia for Blackwell, with strong orders coming through from this customer. We expect Infineon to continue to have a high market share in subsequent Nvidia platforms like Rubin as well, even though component supply for such high volume platforms is likely to be multi-sourced."

115.     Another major competitor, Renasas, similarly reported strength in its Nvidia-related business. During its 4Q24 results briefing, Renasas's management noted it expected to maintain its share of PMICs at Nvidia and to more than double PMIC sales to the company, further underscoring Monolithic's loss of its previously near-exclusive position as Nvidia's PMIC supplier.

116.     On May 5, 2025, the Individual Defendants caused Monolithic to file its Quarterly Report on SEC 10-Q for the first quarter of fiscal year 2025. The 10-Q noted that "[r]evenue from the enterprise data market decreased $16.8 million, or 11.2%, from the same period in 2024. This decrease was primarily due to lower sales of our power management solutions for AI applications . . . ." This decrease further indicated that Monolithic had lost significant AI-related business and that the Individual Defendants' earlier assurances to stockholders regarding the Company's continuing position with Nvidia were materially false and misleading.

## VIII.   ILLICIT INSIDER SALES

117.     Certain of the Individual Defendants – Hsing, Blegen, Chang, Lee, and Zhou – took advantage of the Company's artificially inflated stock price before the truth emerged, selling

34

personally-held Monolithic shares for significant proceeds.

118.     As alleged in the Securities Complaint, during the "Class Period" described therein, defendant Hsing sold a total of 59,765 Monolithic shares for proceeds totaling ***$44,211,500***, while defendant Blegen sold a total of 28,007 Monolithic shares for proceeds totaling ***$21,878,412.***

119.     Further, during that same timeframe, defendant Chang sold 1,100 Monolithic shares for approximately $840,000 in proceeds; defendant Lee sold 1,000 Monolithic shares for approximately $820,000 in proceeds; and defendant Zhou sold 400 Monolithic shares for approximately $300,000 in proceeds.

## IX.     THE SUSTAINED SECURITIES ACTION

120.     As a result of the events described herein the Securities Action was initiated on February 4, 2025.  The operative Securities Complaint was subsequently filed on November 12, 2025, asserting claims against Monolithic and defendants Hsing and Blegen on behalf of a class of investors who purchased or acquired Monolithic shares during the "Class Period" of February 8, 2024 through November 11, 2024.

121.     After the defendants moved to dismiss the operative Securities Complaint, on May 6, 2026, Judge Robart denied the motion to dismiss in substantial part, notwithstanding the materially heightened pleading standards applicable in the Securities Action per the PSLRA. Among other things, Judge Robart concluded that the defendants' public statements made on February 7, 2024, May 1, 2024, and August 1, 2024 were sufficiently alleged to have been materially false and misleading and were actionable.

122.     In (largely) sustaining the Securities Complaint, Judge Robart further held that "***the timing and amounts of [defendants Hsing and Blegen's] stock transactions supports an inference of scienter***." Judge Robart opined that the insider sales by defendants Hsing and Blegen were "***suspicious***", despite the fact that those transactions were made pursuant to Rule 10b5-1

trading plans, because: (a) defendants Hsing and Blegen "*sold a substantial amount of stock*", (b) the sales were made "on February 8, 2024; March 1, 2024; May 1, 2024, and on November 8, 2024; *prior to the release of the Edgewater Research Report*", (c) it was uncontested that *most of the sales "were not made in connection with a tax obligation*"; and (d) it was uncontested that "*the volume of trades during the Proposed Class Period greatly exceeded the volume of trades in the two years preceding the Proposed Class Period, when [defendants Hsing and Blegen] 'rarely, if ever, sold shares except to cover tax liabilities attendant to their acquisition of more stock*.'"

123.    The Securities Complaint alleged additional bases for the inference of scienter besides the suspicious insider trading by defendants Hsing and Blegen, including (1) the defendants' misstatements regarding Monolithic's quality control issues; (2) defendants' statements concerning Monolithic's core operations; and (3) the temporal proximity between the defendants' false statements and the revelation of the truth about the relationship between Monolithic and Nvidia.  But, given Judge Robart's finding that the challenged insider stock sales were suspicious and supported a strong inference of scienter, Judge Robart did not need to and did not address the remaining alleged bases for the scienter inference.

124.    Following Judge Robart's May 6, 2026 ruling, the Securities Action against the Company is now proceeding towards trial.

## X.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

125.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

126.    Plaintiff is a current shareholder of the Company, was a shareholder of the Company at the time of the Individual Defendants' wrongdoing alleged herein, and has been a

shareholder of the Company continuously since January 2024.

127.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

128.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

129.    The Board currently consists of the following seven (7) individuals -- defendants Hsing, Chang, Elmiger, Lee, Zhou, Martinez, and Wynne (the "Demand Directors"). A derivative plaintiff need only demonstrate reason to doubt that a majority of the Company's current Demand Directors are disinterested or objective in order to establish pre-suit demand excusal. Plaintiff has adequately alleged that there is reason to doubt that at all seven of the current Demand Directors of Monolithic are capable of disinterestedly and/or independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

130.    Defendant Hsing is the Company's longtime President and CEO, and his principal professional occupation is his role as Monolithic's Chairman, President, and CEO.  Therefore, there is reason to doubt that defendant Hsing could respond independently to a shareholder demand, and demand was not required upon him.  Indeed, in the Company's own most recent Annual Proxy Statement, the Board admits that defendant Hsing is not an independent director. Further, as alleged above, defendant Hsing, by virtue of his challenged, suspicious insider stock sales (which Judge Robart concluded have given rise to a strong inference of scienter in the Securities Action) received direct financial benefits which were not shared with Monolithic shareholders, and thus there is also reason to doubt that defendant Hsing could respond

37

disinterestedly to a shareholder demand. Moreover, defendant Hsing is a named individual defendant in the Securities Action, and has had federal securities fraud claims sustained against him in that case notwithstanding the materially heightened PSLRA pleading standards. Thus, defendant Hsing is exposed to potential individual financial liability, cannot be disinterested, and cannot exercise independent business judgment on the issue of whether Monolithic should prosecute this derivative action. Defendant Hsing's liability is not speculative, and his substantial likelihood of personal liability is sufficient to excuse demand.

131. Defendants Chang, Lee, and Zhou, by virtue of their challenged, suspicious insider stock sales, received direct financial benefits which were not shared with Monolithic shareholders, and thus there is reason to doubt that defendants Chang, Lee, and Zhou could respond disinterestedly to a shareholder demand. Critically, the insider sales made by Chang, Lee, and Zhou alleged herein were executed during the same timeframe as the insider sales made by defendants Hsing and Blegen that have been challenged in the Securities Action, and which Judge Robart has already concluded were suspicious and give rise to a strong inference of scienter. Accordingly, the only reasonable inference is that the insider sales made during that same timeframe by defendants Chang, Lee, and Zhou are also suspicious, and accordingly there is reason to doubt that they are disinterested.

132. Defendants Chang, Lee, Zhou, and Wynne have served as members of the Audit Committee during the Relevant Period. The Company's Audit Committee Charter states that the members of the Audit Committee were and are responsible for, among other things, overseeing the Company's financial reporting and disclosure process. Defendants Chang, Lee, Zhou, and Wynne, among other things, caused and/or permitted the Company to adopt ineffective internal controls over disclosure and financial reporting, which have rendered certain of the Company's

previously disseminated statements false and misleading, and the basis for the sustained Securities Action. These actions caused defendants Chang, Lee, Zhou, and Wynne to breach their fiduciary duties and now subject each of them to a substantial likelihood of liability. Accordingly, demand was not required on Chang, Lee, Zhou, and Wynne.

133. All seven of the Demand Directors signed the Company's materially false and misleading 2023 10-K described herein, and solicited the materially false and misleading 2024 Proxy Statement described herein. Accordingly, the Demand Directors each face a substantial likelihood of liability for breaches of their non-exculpable fiduciary duties.

## COUNT I
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

134. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

135. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

136. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

137. Under the direction and watch of defendants Hsing, Chang, Elmiger, Lee, Martinez, Wynne, and Zhou, the 2024 Proxy Statement was materially false and misleading and failed to disclose, among other things, that: (1) the Company's voltage regulator modules and power management integrated circuits had been plagued by serious quality control and performance problems; (2) these defects detrimentally affected the performance of certain Nvidia products in which such Company products were used; (3) the Company knew about, but failed to adequately address and resolve, the issues plaguing the performance of the power management solutions Monolithic provided to Nvidia; (4) as a result of the foregoing, Monolithic's relationship with Nvidia, its most important customer, had been irreparably harmed. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

138. Moreover, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions, and the Company's Code of Conduct was not being followed.

139. The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the re-election of directors.

140. As a result of the Individual Defendants causing the 2024 Proxy Statement to be false and misleading, the Company's stockholders voted, among other things, to: (1) re-elect defendants Elmiger, Wynne, and Zhou to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of E&Y as the Company's

40

independent registered public accounting firm for 2024; and (3) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers.

141.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

142.    Plaintiff, on behalf of Monolithic, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act

143.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

144.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Monolithic. Indeed, as a result of this scheme, Monolithic is now forced to defend itself against sustained claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in the Securities Action, as described herein.

145.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

146.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about Monolithic not misleading.

147.    The Individual Defendants, as top executives and directors of the Company, are

liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Monolithic. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

148.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executives and/or directors of the Company, as members of the Board, the Individual Defendants then serving as directors signed the Company's false and misleading statements filed with the SEC during the Relevant Period.

149.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

150.    Plaintiff, on behalf of Monolithic, has no adequate remedy at law.

### COUNT III
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

151.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

152.    The Individual Defendants, by virtue of their positions with Monolithic and their

specific acts, were, at the time of the wrongs alleged herein, controlling persons of Monolithic within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause the Defendants to engage in the illegal conduct and practices complained of herein.

153.    Plaintiff, on behalf of Monolithic, has no adequate remedy at law.

**COUNT IV**
**Against Defendants Hsing and Blegen for Contribution Under Sections 10(b) and 21D of the Exchange Act**

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.    Monolithic and defendants Hsing and Blegen are named as defendants in the Securities Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. Those claims have been largely sustained by Judge Robart, notwithstanding the materially heightened PSLRA pleading standards. If and when the Company is found liable in the Securities Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to defendants Hsing's and Blegen's willful and/or reckless violations of their obligations as officers and/or directors of Monolithic.

156.    Defendants Hsing and Blegen, because of their positions of control and authority as officers and/or directors of Monolithic, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Monolithic, including the wrongful acts complained of herein and in the Securities Action.

157.    Accordingly, defendants Hsing and Blegen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15

U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

158.    As such, Monolithic is entitled to receive all appropriate contribution or indemnification from defendants Hsing and Blegen.

## COUNT V
### Breach of Fiduciary Duty Against the Individual Defendants

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.    The Individual Defendants, as current or former Monolithic officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

161.    By virtue of their positions as Monolithic directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

162.    Each Individual Defendant was required to: (a) use his or her ability to control and manage Monolithic in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Monolithic rather than his or her own interests.

163.    By their acts alleged herein, including but not limited to causing Monolithic to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

164.    The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

44

165.   Monolithic has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## COUNT VI
### Against the Individual Defendants for Unjust Enrichment

166.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

167.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Monolithic.

168.   Plaintiff, as a shareholder and representative of Monolithic, seeks restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VII
### Against Defendants Hsing, Blegen, Chang, Lee, and Zhou for Breach of Fiduciary Duty for Insider Trading

169.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170.   Defendants Hsing, Blegen, Chang, Lee, and Zhous (the "Trading Defendants") sold a substantial number of shares of Monolithic during the time period in which they were carrying out the above-described schemes which they knew had the effect of artificially inflating the Company's stock price.

171.   The Trading Defendants were in possession of material non-public information regarding the above-described schemes at the time in which they were selling shares of Monolithic in breach of their non-exculpable fiduciary duties of loyalty and good faith, and the concealment of this material non-public information allowed the Trading Defendants to knowingly sell their

shares at artificially inflated prices.

172.    Plaintiff, as a shareholder and representative of Monolithic, seeks restitution from the Trading Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Trading Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, violations of federal securities law, and other state laws;

B.    Directing Monolithic to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Awarding to Monolithic restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


DATED: June 16, 2026                    Respectfully Submitted,

                                        **SAXENA WHITE, P.A.**

                                        _/s/  Adam Warden_
                                        Adam Warden (Fla. Bar # 0873691)
                                        7777 Glades Road, Suite 300
                                        Boca Raton, FL 33434
                                        (561) 394-3399
                                        awarden@saxenawhite.com

                                        Kip B. Shuman
                                        **SHUMAN, GLENN & STECKER**
                                        100 Pine Street, Ste. 1250
                                        San Francisco, CA 94101
                                        Telephone: (303) 861-3003
                                        Facsimile: (303) 536-7849
                                        kip@shumanlawfirm.com

                                        Brett D. Stecker
                                        **SHUMAN, GLENN & STECKER**
                                        326 W. Lancaster Avenue
                                        Ardmore, PA 19003
                                        Telephone: (303) 861-3003
                                        Facsimile: (303) 536-7849
                                        brett@shumanlawfirm.com

                                        **RM LAW, P.C.**
                                        Richard Maniskas
                                        1055 Westlakes Drive, Suite 300
                                        Berwyn, PA 19312
                                        (484) 324-6800
                                        rmaniskas@rmclasslaw.com

                                        *Attorneys for Plaintiff William Moore*